

## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT NASHVILLE

| | | |
|---|---|---|
| **DONALD REICHENBERGER,** | ) | **Docket No 2018-06-1822** |
| **Employee,** | ) | |
| **v.** | ) | |
| **CUMBERLAND REAL ESTATE** | ) | **State File No. 89824-2016** |
| **SERVICES, INC.,** | ) | |
| **Employer,** | ) | |
| **And** | ) | **Judge Robert Durham** |
| **NORGUARD INS. CO.,** | ) | |
| **Carrier** | ) | |

## EXPEDITED HEARING ORDER GRANTING BENEFITS IN PART AND DENYING BENEFITS IN PART

This case came before the Court on May 28, 2021, for an Expedited Hearing. Mr. Reichenberger sought authorization of a multi-level fusion surgery in his low back, as recommended by his authorized physician. He also sought additional temporary disability benefits. Cumberland Real Estate Services, Inc. (CRES) denied the surgery, arguing that the fusions fail to address conditions primarily arising out of Mr. Reichenberger's work injury and are unnecessary to treat his symptoms. Based on the evidence, the Court denies the requested surgery but awards additional temporary disability benefits.

### History of Claim

Mr. Reichenberger worked as a landscaper for CRES. On November 9, 2016, he attempted to pull a root from the ground when he felt severe pain in his low back that caused him to fall to the ground. The pain eventually subsided, but two days later he slipped and fell on his buttocks. By that night, his left leg was completely numb. At seventy-two years old, he had never experienced severe low-back pain or numbness to this extent before.

CRES accepted Mr. Reichenberger's claim and stipulated to compensability of his

1

L3-4 disc herniation at the hearing. He underwent a lumbar MRI that revealed significant lumbar disc degeneration, including the herniated disc at L3-4, and an EMG. CRES provided a panel of neurosurgeons, and Mr. Reichenberger chose Dr. Chine Logan, a board-certified neurosurgeon with Vanderbilt Medical Center, as his treating physician. He underwent several months of conservative treatment without significant improvement.

CRES then requested an independent medical evaluation with neurosurgeon Tarek Elalayli. Mr. Reichenberger told Dr. Elalayli that he primarily suffered from low-back pain, although he also had occasional bouts of leg pain and sometimes felt his left leg was "going to give out." Dr. Elalayli believed that Mr. Reichenberger's L3-4 herniation was consistent with his work-related injury, and a left 3-4 microdiscectomy, while not medically necessary, was a treatment option. He did not mention anything regarding surgery at L5-S1.

After Dr. Elalayli's evaluation, Mr. Reichenberger underwent another MRI. The report suggested that Mr. Reichenberger suffered from a disc herniation at L3-4 and bilateral pars defects with "borderline Grade 2 disc anterolisthesis," or disc slippage, at L5-S1. The L5-S1 degeneration severely narrowed the holes where the L5 nerve roots exit the spine, causing compression on both nerves.

Dr. Logan then recommended an L5-S1 fusion with decompression at L4-5 without mentioning the L3-4 herniation.[1] CRES authorized surgery, and in February 2018, Dr. Logan performed a decompression at L3-4 and a decompression and fusion at L5-S1. Mr. Reichenberger initially reported significant improvement, but the back pain and the bilateral leg pain and numbness returned in a few months. Conservative care, including lumbar epidural steroid injections, provided only temporary relief.

Dr. Logan eventually ordered a CT scan that he interpreted as showing that Mr. Reichenberger suffered a pseudoarthrosis, or failed fusion, at the L5-S1 level. In May 2019, he recommended a five-level decompression and fusion, from L2 through the ilium.

CRES sent the recommendation through utilization review. The reviewer, a neurosurgeon, did not certify the proposed surgery. She stated that Dr. Logan did not make sufficient objective clinical findings to support a five-level fusion and did not exhaust conservative measures before contemplating the surgery. Mr. Reichenberger appealed, and the Bureau's Assistant Medical Director, Dr. James Talmage, issued a decision agreeing with the denial because Dr. Logan did not provide a rationale for making an exception to the evidence-based guidelines adopted by the Bureau.

---

[1] In his deposition, Dr. Logan admitted that his records are replete with errors. He agreed that he never performed surgery at the L4-5 level, although his record contains several references that he did.

2

Dr. Logan modified his proposal by offering to do "posterolateral" fusions instead of "interbody" fusions, but he still insisted on doing fusions at five levels. CRES denied this proposition as well.

Mr. Reichenberger then underwent an evaluation with neurosurgeon Dr. George Lien to address the reasonableness and necessity of an L2-ilium fusion. Dr. Lien, who is board-certified in neurosurgery, did not believe that the multi-level fusion was reasonable or necessary to treat Mr. Reichenberger.

In his deposition, Dr. Lien stated that Mr. Reichenberger's primary complaint was numbness and tingling in his legs, and that he had relatively little back discomfort. On reviewing the post-surgical CT scan, he could not see "clear bridging bone" present at the L5-S1 level, so he could not say that there was a clear fusion. However, the screws and rods were all in a good position. He felt that, despite the surgical decompression, there remained a moderate degree of narrowing of the nerve root openings at L5-S1. He also noted that the L5-S1 disc had degenerated to the point that the disc space collapsed, leaving the vertebrae essentially on top of each other. Thus, even if the fusion had failed, he still should not feel much back pain at that level because the vertebrae would not have any room to move.

Dr. Lien stated that a multi-level fusion was not "a very good idea." However, he had never treated a patient that required a fusion at that many levels. Also, since Mr. Reichenberger had already suffered a potentially failed fusion at one level, it was "relatively unlikely" that all those levels would successfully fuse. He said that the risks of a failed fusion and/or residual back pain and complications arising from additional pressure on adjacent levels increase with fusions at multiple levels.

Further, Dr. Lien testified that a fusion was not likely to improve Mr. Reichenberger's symptoms because he primarily complained of numbness and tingling in his legs. Making a larger space for the nerve root would best serve his complaints, but how much could be done is limited. He agreed that an argument could be made for a revision fusion if Mr. Reichenberger's primary complaint were low-back pain. However, he would try more conservative measures, such as radiofrequency ablation, before proceeding with the fusion. Finally, he commented that Mr. Reichenberger told him that he did not want fusion surgery.

Mr. Reichenberger submitted Dr. Logan's deposition to support his request for a multi-level fusion. On direct examination, much of Dr. Logan's causation opinions assumed that the EMG done shortly after the work incident noted acute radiculopathy in the L5 nerve root. He later admitted on cross that he was mistaken in this assumption. Regardless, he testified that though Mr. Reichenberger suffered from Grade 1 spondylolisthesis at L5-S1 before the incident, the L5 nerve roots responded to the work injury because "either things got worse with a shift or something has caused or had

3

caused that L5 nerve root to become acute and start to give him his symptoms."

To further address causation, Dr. Logan also testified that Mr. Reichenberger's complaints of weakness and his left leg "giving out" was evidence of worsening L5 nerve root compression following the 2016 incident. He stated the reason he did the surgery was to intervene and relieve symptoms that "started with the [work-related] event." In summary, he testified that Mr. Reichenberger's 2016 work injury, while not causing his spondylolisthesis at L5-S1, did exacerbate the condition.

As for his recommended L2-ilium fusion, Dr. Logan testified that Mr. Reichenberger's recurrent symptoms and the post-surgical CT scan confirmed that the L5-S1 fusion had failed and needed to be redone. To prevent it from failing again, he believed that the levels immediately above and below L5-S1 should be fused as well to stabilize those discs and keep them from slipping. He recommended fusions at L2-3 and L3-4 for the same reasons.

Dr. Logan added that he would not agree to simply redo the L5-S1 fusion because he thought the risk of recurrence was too great. He offered to do posterolateral, as opposed to interbody, fusions because he believed they are less invasive, but CRES rejected this recommendation. His offer to refer Mr. Reichenberger for a second opinion was also declined.

In the end, Dr. Logan noted that, contrary to Dr. Lien's statement, Mr. Reichenberger complains of significant low-back pain plus leg pain and paresthesia. He stated that Mr. Reichenberger is a "straightforward nice guy" who has been dealing with this problem for years, and he hated to see him in "horrible pain." He believed that the L2-ilium fusion was the best option for some relief.

After the depositions were taken, Mr. Reichenberger went to Dr. Jeffrey Hazlewood for a pain management evaluation. Dr. Hazlewood reported that Mr. Reichenberger primarily complained of low-back pain with some numbness and tingling in his lower extremities. He found Mr. Reichenberger to be very credible regarding his pain complaints and suggested that opioid treatment was a viable option for managing his pain.

At the hearing, Mr. Reichenberger confirmed that he continues to experience significant low-back and leg pain and numbness that severely restricts his daily activities. While the occasional pain and numbness in his legs and feet are bothersome, his low-back pain limits him the most.

Mr. Reichenberger further testified that he is unable to return to CRES due to his physical limitations. However, he has mowed some neighbors' yards in 2021, making $350 to $400 per month, but he has made no more than $2,000 doing so. CRES

4

stipulated to a $400 weekly compensation rate, and that it stopped paying temporary partial disability benefits on November 5, 2020.

Contrary to Dr. Lien's testimony, Mr. Reichenberger wants to go through with the L2-ilium fusion. He is very tired of his constant pain and just wants some relief so that he can get back to being more active.

**Findings of Fact and Conclusions of Law**

To recover, Mr. Reichenberger must present evidence from which this Court can determine he is likely to prevail at a hearing on the merits that he suffered a compensable injury at L5-S1 and that the multi-level fusion recommended by Dr. Logan is reasonable and necessary to treat this injury. *See generally McCord v. Advantage Human Resourcing*, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *9 (Mar. 27, 2015). If he does so, then he is not at maximum medical improvement and is entitled to additional temporary partial disability benefits.

It is undisputed that Mr. Reichenberger suffered a work-related low-back injury in November 2016 resulting in an L3-4 disc herniation. It is further undisputed that Mr. Reichenberger suffered from significant spondylolisthesis and stenosis at L5-S1 before his injury. The disputes are whether the 2016 injury caused a compensable aggravation of the pre-existing condition at L5-S1 and whether recommended treatments are reasonable and necessary.

To prevail on causation, Mr. Reichenberger must prove to a "reasonable degree of medical certainty that the aggravation arose primarily" out of his work-related injury. Tenn. Code Ann. § 50-6-102(14)(A). He must also prove that this aggravation "contributed more than fifty percent" in causing Mr. Reichenberger's disablement and need for treatment at the L5-S1 level. Tenn. Code Ann. § 50-6-204(14)(C). "Reasonable degree of medical certainty" means "it is more likely than not considering all causes, as opposed to speculation or uncertainty." *See* Tenn. Code Ann. § 50-6-102(14)(D). Given that the standard requires "medical certainty," causation must be shown through an expert medical opinion. *Id.*

Dr. Logan was the only physician to provide a causation opinion. However, it is less than explicit, and its value is somewhat lessened by the fact that his records and testimony are filled with errors and inaccuracies. Nevertheless, he gave his opinion that the accident exacerbated Mr. Reichenberger's previously asymptomatic condition at L5-S1 and placed additional pressure on the L5 nerve roots. This resulted not only in back pain but also bilateral radiculopathy causing pain, numbness, and weakness in his legs. He stated the reason he did the surgery was to intervene and address symptoms that "started with the [work-related] event."

5

Mr. Reichenberger's testimony about his condition must also be considered. *Orrick v. Bestway Trucking, Inc.*, 184 S.W.3d 211, 217 (Tenn. 2006). Dr. Logan described him as a "straight-forward nice guy." The Court agrees and finds that Mr. Reichenberger was a candid, credible witness who did not exaggerate or mischaracterize his history or symptoms. He testified that he had never experienced any significant low-back pain or radiculopathy before his work injury. The Court has no reason to doubt his truthfulness and finds this testimony bolsters Dr. Logan's causation opinion.

However, Dr. Logan's opinion must still be sufficiently certain as to causation for Mr. Reichenberger to show he is likely to prevail at trial. The opinion does not have to contain specific language from Tennessee Code Annotated section 50-6-102(14) for the Court to find causation, but it must be enough to meet the statutory standard. *See Thysavathdy v. Bridgestone Ams. Tire Operations,* No. M2017-01575-SC-R3-WC, 2018 TN LEXIS 313, at *26 (Tenn. Workers' Comp. Panel June 8, 2018).

Although Dr. Logan's testimony is not ideal, the Court holds it, along with Mr. Reichenberger's account, are sufficient at this stage to prove a compensable aggravation of Mr. Reichenberger's pre-existing condition at L5-S1, thus creating the need for treatment. Given this holding, the Court further holds that the failed fusion at L5-S1 is also compensable. *Creasman v. Waves, Inc.*, 2018 TN Wrk. Comp. App. Bd. LEXIS 13, at *12 (April 16, 2018)(quoting *Rogers v. Shaw*, 813 S.W.2d 397, 400 (Tenn. 1991)("[A]ll the medical consequences and sequelae that flow from the primary injury is compensable.")

The Court now turns to the multi-level fusions recommended by Dr. Logan. An employer's obligation to provide treatment for a work injury is limited to that which is "reasonably necessary" by the accident. Tenn. Code Ann. § 50-6-204(a)(1)(A). Here, the Court is presented with different opinions as to what constitutes "reasonably necessary" treatment, and the Court has discretion to determine which opinion to accept. *Patterson v. Huff & Puff Trucking*, 2018 TN Wrk. Comp. Bd. LEXIS 33, at *9 (July 6, 2018). When deciding, the Court may consider, among other things, "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts." *Bass v. The Home Depot U.S.A, Inc.*, 2017 TN Wrk Comp. App. Bd. LEXIS 36, at *9 (May 26, 2017).

Dr. Logan is a board-certified neurosurgeon and has treated Mr. Reichenberger for years. He testified that the post-surgical CT scan and Mr. Reichenberger's renewed symptoms showed that the L5-S1 fusion was unsuccessful. He strongly recommended a multi-level fusion as the best way to provide pain relief and prevent future problems, and he refused to consider doing only a repeat fusion at L5-S1. Since he is the authorized physician, his recommendation is presumed to be reasonably necessary. Tenn. Code

Ann. § 50-6-204(a)(3)(H).[2]

Dr. Lien is also a board-certified neurosurgeon. He agreed that it appeared the fusion did not take. While he did not believe that a repeat fusion was absolutely necessary, it was an option. However, he felt that Dr. Logan's recommendation for a multi-disc fusion was generally "not a good idea" and not likely to be successful given the failed fusion at L5-S1. Dr. Lien's opinion is somewhat weakened by his testimony that Mr. Reichenberger did not suffer from significant low-back pain and did not want the multi-level fusion, which is contrary to the records and Mr. Reichenberger's own testimony. However, the Court does not find this to be fatal to his opinion, since both the UR physician and Dr. Talmage agreed that a multi-level fusion is not reasonable and necessary.

After weighing the evidence, the Court finds that Dr. Lien's opinion, supported by the UR doctor and Dr. Talmage, is sufficient to overcome the presumption afforded to Dr. Logan's opinion regarding the need for an L2-ilium fusion. However, Mr. Reichenberger is still entitled to medical treatment for his work-related injury, which includes the pseudoarthrosis at L5-S1. If Dr. Logan is unable or unwilling to provide treatment after this ruling, CRES shall provide Mr. Reichenberger another panel of neurosurgeons from which he may choose a new treating physician. Tenn. Code Ann. § 50-6-204(a)(3)(G).

The last issue is temporary partial disability benefits. Mr. Reichenberger must prove: (1) a partial disability from working as the result of a compensable injury; (2) a causal connection between the injury and the inability to work; and (3) the duration of the period of disability. *Shepherd v. Haren Constr. Co., Inc.,* 2016 TN Wrk. Comp. App. Bd. LEXIS 15, at *13 (Mar. 30, 2016). He must also show the difference between what he could have earned in his partially disabled state and his average weekly wage. Tenn. Code Ann. § 50-6-207(2)(A).

Here, the Court finds that since Mr. Reichenberger requires additional treatment for his work injury, he has yet to reach maximum medical improvement. The undisputed testimony showed that while he was unable to return to his pre-injury employment after CRES stopped his temporary disability benefits, he has performed some yardwork for his neighbors. He estimated that he makes $350 to $400 per month with an estimated total income of $2,000 thus far.

Thus, the Court holds that Mr. Reichenberger is entitled to past temporary partial disability benefits from November 5, 2020, when CRES stopped paying him, through the present. Based on Mr. Reichenberger's testimony that he has made $2,000.00 during this

---

[2] The parties agreed that Dr. Logan's opinion did not follow the ODG Guidelines and thus did not have to be rebutted by clear and convincing evidence under Tennessee Code Annotated section 50-6-204(a)(3)(I).

period, he averaged $63.00 per week. This amount subtracted from his average weekly wage of $600.00 results in $537.00. Two thirds of $537.00 provides a compensation rate of $358.00. Thus, Mr. Reichenberger is entitled to past temporary partial disability benefits in the amount of $11,353.71. Given Mr. Reichenberger's estimated current income of $400 per month, or $93.33 per week, CRES shall pay ongoing temporary partial disability benefits at the rate of $337.78 per week until he reaches maximum medical improvement or can return to work at his pre-injury wage.

IT IS, THEREFORE, ORDERED THAT:

1. Dr. Logan's recommended L2-ilium fusion is denied. However, CRES shall continue to provide reasonable and necessary medical treatment of Mr. Reichenberger's 2016 work injury, which includes the failed fusion at L5-S1. Should Dr. Logan refuse to continue providing treatment, CRES shall provide a panel of neurosurgeons from which Mr. Reichenberger may choose another authorized physician.

2. CRES shall pay $11,353.71 in past temporary partial disability benefits and shall pay ongoing temporary partial disability benefits at the compensation rate of $337.78 per week until Mr. Reichenberger reaches maximum medical improvement or can return to work at his pre-injury wage.

3. This case is set for a Scheduling Hearing on **August 29, 2021, at 9:00 a.m. Central Time**. The parties must call 615-253-0010 to participate. Failure to appear may result in a determination of the issues without the party's participation.

4. Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the seventh business day after entry of this Order. Failure to submit the necessary confirmation within the period of compliance might result in a penalty assessment for non-compliance. For questions regarding compliance, please contact the Workers' Compensation Compliance Unit via email at WCCompliance.Program@tn.gov.

**ENTERED on June 15, 2021.**

8

_____  _____
**ROBERT DURHAM, JUDGE**
**Court of Workers' Compensation Claims**

## APPENDIX

Technical Record:
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Expedited Hearing

Exhibits:
1. Wage Statement
2. Mr. Reichenberger's Rule 72 Statement
3. Mr. Reichenberger's deposition
4. Index of Medical Records
5. Utilization Review Report
6. UR Appeal Denial
7. Dr. Lien's Deposition
8. Dr. Logan's Deposition

## CERTIFICATE OF SERVICE

I certify that a copy of this Order was sent as indicated on June 15th, 2021.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|----------------|---------|-----------|------------------|
| David Goodman | | | X | dgoodman@forthepeople.com rschow@forthepeople.com |
| Allen Callison | | | X | Allen.callison@mgclaw.com Carmen.Perez@mgclaw.com |

_____
**Penny Shrum, Clerk of Court**
**Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury: _____**

_____
**Employee**

v.

_____
**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____     ☐ Motion Order filed on _____

☐ Compensation Order filed on_____     ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____
_____
_____
_____

## Parties

**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 ____.

_____
*[Signature of appellant or attorney for appellant]*